IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DONALD SPRINGER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 05 C 6487 |
| | ) |
| JOANNE B. BARNHART, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Donald Springer ("Springer") seeks judicial review of a
final decision of Commissioner of Social Security Jo Anne
Barnhart ("Commissioner") that denied Springer's application for
disability insurance benefits under Title II of the Social
Security Act ("Act"), 42 U.S.C. §§416(I), 423.[1]  Both sides have
moved for summary judgment under Fed. R. Civ. P. ("Rule") 56,
with Springer having moved alternatively to remand for further
proceedings.  For the reasons stated in this memorandum opinion
and order, both parties' Rule 56 motions are denied but
Springer's alternative motion to remand is granted.

## Procedural Background[2]

Springer filed an application for benefits on March 11,

---

[1] All further statutory references will take the form
"Section --," using the Title 42 numbering rather than the Act's
internal numbering.  All 20 C.F.R. provisions will be cited as
"Reg. §--."  Finally, Commissioner's memorandum will be cited as
"C. Mem."

[2] What follows as to both procedure and factual substance is
drawn from the administrative record (cited "R. --").

2003, asserting a disability onset date of May 3, 2002 (R. 61-63). On May 15, 2003 his application was initially denied, and on July 9, 2003 it was again denied upon reconsideration (id. 28-31, 33-36). After Springer then filed a timely request for hearing, on February 17, 2005 he--now represented by counsel--appeared before ALJ John Mondi ("Mondi") for that purpose (at the "Hearing") (id. 183-207). Both Springer and vocational expert Cheryl Hoiseth ("Hoiseth") testified at the Hearing. ALJ Mondi's June 20, 2005 decision concluded that Springer was not disabled (id. 19).

Springer filed a request for review with the Appeals Council on August 11, 2005 (R. 7). After reviewing the ALJ's decision, the Appeals Council denied reversal or remand on September 16, 2005 (id. 4-6). On November 11, 2005 Springer filed a timely complaint for judicial review.

## Factual Background

Springer was born on January 24, 1951 and was thus 54 years old at the time of the Hearing (R. 61). He is 5 feet 11 inches tall and weighs about 170 pounds (id. 131). As for his education, Springer completed high school and three years of college, during which he studied mechanical engineering (id. 81, 189). Springer has extensive experience working in the construction contracting field as a sales engineer, project manager and site engineer (id. 76, 191-93). Although he stopped

2

performing full-time work in May 2002, at the time of the Hearing he worked part-time performing minor maintenance projects (id. 189-90).

Springer suffers from lower back pain radiating into his buttocks and left leg and numbness in his left calf and foot. His first effort to obtain treatment was in May 2002 (R. 109-32), when he was taken to the emergency room at St. Joseph's Hospital after experiencing pain in his lower back and leg, tingling in his chest and shortness of breath while he was walking home from a bar (id. 109, 125, 127). At that time his head and neck, spinal and chest examination were all unremarkable, and his stress test was negative for ischemia[3] (id. 111, 127, 130-32).

Springer returned to the hospital just three months later (on August 23). He was evaluated by Dr. Ernie for complaints of numbness and tingling in his left foot and stiffness in his lower back and neck (R. 156). On examination Dr. Ernie found that Springer had spondylolisthesis[4] and that his straight-leg raising test was positive on his left leg (id. 154, 156). Springer's dorso-lumbar motion was normal (id. 156).

_____

[3] Ischemia is local anemia due to mechanical obstruction of the blood supply (Stedman's Medical dictionary ["Stedman's"] 924 (27th ed. 2000)).

[4] Spondylolisthesis is (Stedman's at 1678):

Forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum.

3

To ameliorate his lower back pain, Springer sought chiropractic treatment. But as Springer reported on September 23, 2003 to Dr. Raiminder Kumar, those treatments did not resolve his pain (R. 158). On examination Dr. Kumar found no palpable pulse for certain arteries in Springer's leg and foot-- in particular, for his posterior tibial artery on the right, for his posterior tibial and dorsalis pedis arteries on the left and for his popliteal artery on either side (id. 159). Springer's left foot plantar flexion was 5-/5, Springer's lumbosacral spine range of motion was good and his straight-leg raising test was negative. Dr. Kumar ordered an MRI of the lumbosacral spine to determine whether Springer had peripheral vascular disease or a herniated disc (id.).

That MRI, performed on November 4, 2003, showed some decrease in the L5/S1 disc signal, a 14 mm hemangioma, some encroachment of the L5 neural foramens, first-degree anterolistehsis[5] of L5 on S1 and a suggestion of bilateral L5 spondylolysis[6] (id. 161-62). There was no evidence of disc herniation on the MRI (id. 161).

Just one month later, on December 29, Springer began seeing

---

[5] Anterolisthesis is "vertebral body displacement toward the front" (4-12 Attorney's Textbook of Med. §12.30).

[6] According to Stedman's at 1678, spondylolysis is "[d]egeneration or deficient development of a portion of the vertebra." Spondylolysis can result in spondylolisthesis (id.).

4

Dr. Janice Marie Wood "to establish for medication and care" (R. 164). Springer reiterated to Dr. Wood his complaints of burning in his buttock, which was exacerbated by sitting and lying down, and pain and numbness in his left foot and calf (id.). Springer also reported that he now had pain in the small of his back throughout the day, some numbness in his right fingers and blurry vision and dizziness with his right neck rotation (id. 164-65). When Dr. Wood examined Springer, his straight-leg raising test was negative and there was no spine tenderness or scoliosis (id.) But Dr. Wood, like Dr. Kumar, found a number of abnormalities in Springer's extremities for which she referred Springer to the Peripheral Vascular Clinic: Those abnormalities included non-palpable posterior tibial and dorsalis pedis pulses, poor capillary refill and a poor femoral pulse on his left side (id. 165).

At the Peripheral Vascular Clinic on February 20, 2004, Springer again complained of left foot and leg numbness, lower back pain and a burning sensation in his buttock (R. 167). Dr. Aaron Lackamp diagnosed Springer with a "mixed picture of neurogenic/vascular claudication,"[7] with the symptoms being more

[7] Claudication is "[l]imping, usually referring to intermittent" (Stedman's at 360). Intermittent claudication is (id.):

> a condition caused by ischemia of the muscles; characterized by attacks of lameness and pain, brought on by walking, chiefly in the calf muscles.

5

consistent with neurogenic claudication (id. 168). Dr. Lackamp
also noted that Springer had absent pedal pulses and a diminished
femoral pulse on the left side of his body, indicating that he
had vascular disease. Springer's Ankle/Brachial Index ("ABI")[8]
was .86 on the right side and .51 on the left side (id. 169).
Dr. Lackamp advised Springer to follow-up with a neurosurgeon.

Before Springer did that, however, he saw Dr. Wood. On
November 26, 2004 Springer again complained that he could not
walk without lower back and leg pain and numbness in his left and
right foot (R. 171). He also said that he had developed numbness
in both arms when he slept on his side (id.). Dr. Wood
reconfirmed that Springer suffered from a combination of
neurogenic and vascular claudication, first degree
anterolisthesis of L5 on S1 and bilateral L5 spondylolysis. She
also provided Springer with new diagnoses of concomitant aorto-

In addition, a patient may also have neurogenic claudication,
which is claudication associated with neurologic injury (id.).

[8] ABI is a test for evaluating arterial blood pressure. To
calculate the index, the ankle blood pressure is divided by the
arm blood pressure. If the index is less than .9, the test is
positive for arterial occlusion (see Attorney's Med. Desk §11:2).

6

iliac disease,[9] superficial femoral artery disease[10] and osteoarthritis with Raynaud's.[11] Like Dr. Lackamp, Dr. Wood referred Springer to a neurosurgeon and recommended an updated MRI (id. 171, 182).

On March 19, 2005 Springer had an MRI taken of his back (R. 182). That MRI appears to have formed the basis of Dr. Peter Letarte's neurosurgical consultation performed on April 11, 2005. Dr. Letarte found that Springer had Grade I L5-S1 spondylolisthesis with nerve root compression (id. 179).[12] Despite Springer's numbness in L5 and S1, Dr. Letarte found that Springer showed no weakness in his lower extremities (id.).

---

[9] Divided into multiple segments, the aorta is a large artery that originates at the left ventricle of the heart and ends at the left side of the body by the ilium--the flaring portion of the hip bone--dividing to form the right and left common iliac arteries (Stedman's at 107, 875).

[10] As Dorland's Illustrated Medical Dictionary 124 (28th ed. 1994) explains:

Vascular surgeons refer to the portion of the femoral artery proximal to the branching of the deep femoral as the common femoral a., and to its continuation as the superficial femoral a.

[11] Dr. Wood did not specify whether Springer had Raynaud's syndrome or Raynaud's phenomenon. Raynaud's syndrome is an "idiopathic paroxysmal bilateral cyanosis of the digits due to arterial and anteriolar contraction" (Stedman's at 1765). Raynaud's phenomenon is a "spasm of the digital arteries, with blanching and numbness or pain of the fingers, often precipitated by cold" (id. at 1365).

[12] In addition the MRI revealed L5-S1 dehydration, indicating disc degeneration, but there were no signs of spinal stenosis or disc protrusion (R. 182).

7

Shortly after that final consultation, on April 18, 2005 Dr. Wood performed a Physician's Capacity Assessment (R. 175), limiting (1) Springer's ability to stand to two hours out of an eight-hour workday and (2) his ability to stand and/or walk to 0 hours (id). Dr. Wood also stated that if Springer were required to sit or stand he would have to change positions every 15 minutes (id.). Those limitations, according to Dr. Wood, were due to "pain" and "weakness" (id.). Dr. Wood further found that Springer could frequently lift up to 10 pounds, occasionally lift up to 50 pounds but never lift more than 50 pounds and that he could occasionally carry up to 20 pounds but never carry anything more because of his back and leg (id. 175-76). Moreover, Dr. Wood found that Springer would be limited in his ability to push and pull and perform repetitive movements with his left foot and that he could only occasionally crawl and could never climb or reach above (id. 176). She stated that Springer's pain was moderate and not chronic and that his nerve/muscle findings and disc abnormality were objective signs of that pain (id. 177-78). Finally, Dr. Wood explained that Springer would probably frequently miss work because of his pain and would therefore be an unreliable worker (id. 178).

In addition to all of that medical evidence, the record includes State agency reviews of Springer's ailments, including a consulting examination of Springer, two Disability Determination

and Transmittal forms and a Residual Functional Capacity ("RFC")
assessment. Those matters are detailed in the next several
paragraphs.

On April 10, 2003 Springer had a consultative examination
with Dr. Roop K. Karri (R. 141-44), who noted that there were no
medical records available for his review (id. 141). Instead
Springer reported orally to Dr. Karri of his ongoing pain and
numbness in his back and left foot (id.). Despite Springer's
pinched nerve, Dr. Karri found that Springer could walk 50 feet
without support (although not on his heels or toes) and that
Springer's range of motion in his knees, hips, ankle and spine
was normal, except that it was painful for him to bend forward
and impossible for him to squat. Additionally, Dr. Karri found
that Springer had decreased sensation in his left foot and that
his straight-leg raising test was negative (id. 143).

In May and June of that same year, Drs. Earl Donelan and
E.C. Bone filled out Disability Determination and Transmittal
forms finding that Springer had "Disorders of back (discogenic
and degenerative)" but that he was not disabled (R. 26-27). Also
in May, Dr. Michael Grant filled out an RFC evaluation (id. 145-
52), observing that Springer had a "history of spondylolisthesis
and pinched nerve of the lumbar region with left side sciatica

with numbness and tingling in the left foot" (id. 152).[13]  Dr.
Grant opined that despite those ailments Springer could lift up
to 50 pounds occasionally and 25 pounds frequently, sit, stand
and/or walk about six hours in an eight-hour workday and had no
restrictions on his ability to push or pull (id. 146).  Dr. Grant
found no additional postural, manipulative, visual, communicative
or environmental limitations (id. 147-50).

To supplement the written record, at the Hearing ALJ Mondi
took testimony from Springer and vocational expert Hoiseth.
Springer explained to ALJ Mondi that he has problems "with the
pinched nerve in my back and I guess I'm not really too sure
about what this blood vessel problem is around the pinched nerve"
(R. 193).  Springer also said that he has problems with the
arteries in his left leg.  According to Springer (R. 193):

   any type of walking, sitting for awhile, standing,
   carrying anything, there's a numbness or a pain that
   starts in the small of my back, works down the rear end
   and then travels down the left leg basically through
   the calf and the thigh and my left foot has been numb
   since that May incident.

Springer stated that he can sit for 15 or 20 minutes or walk
for 15 or 20 yards before he feels pressure in his back (id.
194).  He testified that standing is not as problematic as
sitting or walking and that he can carry his four year-old
daughter for a short distance across the room before he feels

---

[13] Sciatica is "pain in the lower back and hip radiating
down the back of the thigh into the leg" (Stedman's 1602).

10

pain (id. 194-95). He said that he lies down two to three days during the week. To ameliorate the pain, Springer takes six to eight Tylenol #3 per day (id. 195).

In addition to discussing his ailments, ALJ Mondi questioned Springer about his daily living activities. Springer explained that for financial reasons he still does some part-time maintenance work, up to 12 hours a week on average, generally "taking care of elderly people in their homes like changing faucets or outlets" (R. 189, 197).[14] He only does work "that's not very, not a lot of strain. I don't have to stand or sit in front of it for two hours" (id. 198). He explained that if he is feeling pain he will move around a bit or stop work altogether, and if the pain is too great on any given day he will not even come to work (id. 198). Apart from that part-time work, Springer told ALJ Mondi that he babysits his two children but does no other household chores and has no other hobbies or interests (id. 196-97).

After taking that evidence, ALJ Mondi heard testimony from Hoiseth. In questioning Hoiseth the ALJ asked her to assume a hypothetical individual who was of the same age, education and work experience as Springer and was capable of work consistent

---

[14] Springer stated that his fiancee is in the cleaning business and that most of his clients are people whose homes she cleans, so that she drives him to work and he performs his maintenance work while she cleans the home (R. 196).

11

with Dr. Grant's RFC determination (R. 202). According to Hoiseth that hypothetical individual would not be able to do Springer's past work (which was heavy, skilled work) but could do his current part-time work (which was light, semi-skilled work) (id.). Hoiseth also explained to the ALJ that there were skills that Springer had developed from his past work that would be transferable to a position as an administrative support person (id. 202-03). Hoiseth characterized that type of work as "light" and offered that there would be approximately 16,000 jobs available to Springer in that field (id. 203). ALJ Mondi then asked her if there would be any jobs for Springer if Springer's testimony were fully credited, and Hoiseth responded "no" (id. 204).

## ALJ Determination

ALJ Mondi reviewed the submitted evidence and made a series of findings (R. 18-19):

1. Springer "met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act on May 3, 2002, the alleged onset of disability and continues to be insured for benefits through the date of this decision."

2. Springer's "work after the alleged onset of disability is not shown to be substantial gainful activity."

3. Springer's back and foot impairments are "severe" but "do not meet or medically equal any impairment listed in Appendix 1, Subpart P, Regulation No. 4."

12

4.  Springer "has the residual functional capacity for light work."

5.  Although Springer cannot perform his past relevant work, he is able to perform semi-skilled and unskilled work in significant numbers in the national economy.

As a result of those findings, the ALJ held that Springer was not disabled and therefore not entitled to benefits (id. 19).

## Standard of Review

Judicial review of any decision by Commissioner, as authorized by Section 405(g), requires that findings of fact must be upheld if they are supported by substantial evidence. Review is therefore limited to determining (1) whether Commissioner applied the correct legal standards in reaching the decision and (2) whether there is substantial evidence in the record to support the findings (Rice v. Barnhart, 384 F.3d 363, 368-69 (7th Cir. 2004)). Substantial evidence means "no more than such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" (Kepple v. Massanari, 268 F.3d 513, 516 (7th Cir. 2001), quoting--as always in these cases--Richardson v. Perales, 402 U.S. 389, 401 (1971)). In that respect this Court must "review the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner" (Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000)). That does not however call for an uncritical rubber-

13

stamping of Commissioner's decision (id.).

To be eligible for benefits Springer must suffer from a "disability," defined in pertinent part as (Section 423(d)(1)(A)):

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

For that purpose Reg. §404.1520(a)(4) prescribes a sequential five-step test that asks (Briscoe v. Barnhart, 425 F.3d 345, 351-52 (7th Cir. 2005)):

> whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

For all but the fifth step of that test the claimant bears the burden of proof, and an affirmative answer at either step three or step five results in a finding of disability (id. at 352).

## Failure To Articulate at Step Three

Springer first challenges the ALJ's determination at step three, arguing that ALJ Mondi failed to articulate the reasons for his decision and to undertake an analysis of whether Springer's conditions met or equaled a listing (S. Mem. 12-15). Springer suggests that he might qualify under any of the

14

musculoskeletal listings (although Listing 1.05 is the only truly relevant listing) or under cardiovascular Listings 4.11 or 4.12.[15]

Our Court of Appeals has long held that for judicial review to be meaningful an ALJ has a duty to articulate, at least minimally, the bases for his or her decision (see, e.g., Scott v. Barnhart, 297 F.3d 589, 595 (7th Cir. 2002)). At step three that means an ALJ "must discuss the listing by name and offer more than a perfunctory analysis of the listing" (Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004)). There is one narrow exception to the duty to articulate where there is no evidence supporting a determination contrary to the ALJ's ruling (Steward v. Bowen, 858 F.2d 1295, 1299 (7th Cir. 1988)).

In his step three "evaluation" the ALJ said only (R. 16):

> The medical evidence indicates that the claimant has
> foot and back problems, impairments that are "severe"
> within the meaning of the Regulation but that do not

---

[15] Commissioner argues that Springer failed to preserve his step three claim, an issue as to which the parties seem to differ as to the burden of proof at step three--although the parties also seem to be arguing about the burden of proof at different stages of the appeal process. As Commissioner properly notes, Springer bears the burden of proof until step five of the disability determination (Briscoe, 425 F.3d at 352). But it also appears that--at least for the ALJ's review--that burden does not require Springer to actually identify a listing (see Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 120 n.2 (3d Cir. 2000)). In any case, although far from exemplary, Springer's argument regarding step three was sufficient to make out--and preserve--that claim.

15

> meet or medically equal, even in combination, any
> impairment listed in Appendix 1, Subpart P, Regulations
> No. 4, consistent with the assessments of reviewing
> state agency physicians and the evidence at the time
> and that added thereafter.

That single sentence is entirely devoid of any analysis that would enable judicial review. ALJ Mondi does not even mention the specific listings under which he considered Springer's impairments. That omission is particularly frustrating in a case such as Springer's, where there are multiple relevant listings and where the ALJ's six-sentence review of the medical record is perfunctory at best (see Brindisi v. Barnhart, 315 F.3d 783, 786 (7th Cir. 2003)).

As to Springer's musculoskeletal ailments, that failure to articulate appears to fall under the Steward exception: Springer has pointed to no evidence, and this Court's review of the record has revealed no evidence, to suggest that Springer met or equaled Listing 1.05. But it would be a gross understatement to say that about Springer's vascular ailments. Because the ALJ's failures in that respect are so egregious, this opinion must run the risk of boredom by repetition.

Unquestionably ALJ Mondi did not properly address the mass of evidence as to Springer's vascular problems--evidence strongly favoring Springer--despite the ALJ's duty to do so (see Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004)). Although ALJ Mondi noted Dr. Lackamp's finding that Springer had "signs of

16

vascular disease: namely, absent pedal pulses and diminished femoral pulse on the left," he omitted any discussion of earlier evidence by Drs. Kumar and Wood to the same effect.[16] In addition, he left out Dr. Lackamp's diagnosis of neurogenic and vascular claudication and Dr. Wood's diagnoses of superficial femoral artery disease and concomitant aorto-iliac disease. Moreover, the ALJ nowhere mentioned Springer's ABI scores of .86 on the right side and .51 on the left side. That evidence may be just short of meeting Listing 4.12(B)(1), which requires peripheral arterial disease with intermittent claudication and an ABI of less than .50 (Reg Pt. 404, Subpt. P, App. 1, §4.12(B)(1)),[17] but it could certainly equal it (cf. <u>Rivera v. Apfel</u>, 99 F. Supp. 2d 358, 364 (S.D.N.Y. 2000)).[18]

---

[16] Notably ALJ Mondi also failed to evaluate any of Dr. Wood's medical records. Although he said that he discounted Dr. Wood's Physician's Capacity Assessment because it was "not well supported and inconsistent with claimant's part-time work activities," he never explained why he did not address Dr. Wood's treating records (R. 17).

[17] Listing 4.12(B)(1) is not clear as to whether both the right and the left ABI must be under .50 to fulfill the requirement of the Listing or whether having one ABI below the .50 threshold is sufficient. If only the latter is required, it may well be (given the margin of error in medical testing) that if Springer had a different tester or had taken the test at a different hour of the day, he would have met the ABI requirement for his left side.

[18] Under Reg. §404.1526(b) a claimant can equal a listing:

(1)(I) If you have an impairment that is described in appendix 1, but--

17

Commissioner's argument to the contrary is wholly unsatisfactory. Commissioner suggests that the ALJ's opinion should be upheld because he properly relied on (1) the Disability Determination and Transmittal forms and (2) the fact that evidence adduced after the forms showed that Springer's condition did not change (C. Mem. 13-14).

It is of course well established that an ALJ can rely on a State physician's Disability Determination and Transmittal forms for the question of medical equivalence (Scheck v. Barnhart, 357 F.3d 697, 700 (7th Cir. 2004)). But any such reliance is unreasonable where substantial contradictory evidence was introduced after the forms were completed.[19] That is why Social Security Ruling ("SSR") 96-6p (1996 WL 374180, at *3-4) requires an ALJ to get an updated medical opinion on equivalence in just such a circumstance.

---

(A) You do not exhibit one or more of the findings specified in the particular listing, or
(B) You exhibit all of the findings, but one or more of the findings is not as severe as specified in the particular listing.

[19] Although the opinion issued just 10 days ago in Ribaudo v. Barnhart, No. 05-2541, 2006 WL 2328693 (7th Cir. Aug. 11) spoke in the context of whether a claimant meets a listing, our Court of Appeals there reconfirmed (id. at *3 (emphasis added)):

that the ALJ may rely solely on opinions given in Disability Determination and Transmittal forms and provide little additional explanation only so long as there is no contradictory evidence in the record.

That approach, of course, would disqualify the ALJ's reliance.

18

As already described, here there was significant evidence that Springer equaled Listing 4.12(B)(1). That evidence was developed more than six months after State agency physicians had reviewed Springer's record, and there is no suggestion in the State agency reviews that any of Springer's vascular problems were specifically considered (compare Steward, 858 F.2d at 1298 n.5, 1299). While Commissioner tries to save the ALJ's reliance on the Disability Determination and Transmittal forms by arguing that neither Springer's symptoms nor his clinical findings changed thereafter (C. Mem. 14), that argument is flatly belied by the record--specifically by Drs. Lackamp's and Wood's diagnoses of vascular disease and evidence that Springer's symptoms were worsening over time (see, e.g., R. 164-65, 168-69, 171).

It is therefore necessary to reverse the ALJ's error at step three. ALJ Mondi's recital was too cursory to permit meaningful judicial review, and the objective pro-Springer evidence is far too strong to even consider harmless error analysis. Indeed, but for the extraordinarily generous standard of review prescribed by Richardson v. Perales (see the Appendix) an outright reversal rather than a remand could be justified. But with that not in the cards (see, e.g., Gentle v. Barnhart, 430 F.3d 865, 869 (7th Cir. 2005); Brindisi, 315 F.3d at 787, 788), on remand the ALJ needs to review the step three findings and, if they remain the

19

same, must explain why the evidence of vascular disease is not sufficient to equal a listing.[20]

## Credibility Determination

Springer also challenges ALJ Mondi's credibility analysis, again as assertedly too cursory to permit judicial review. Such credibility determinations "generally will not be overtured unless they were 'patently wrong'" (Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001)). But to permit a meaningful review in that regard, an ALJ must articulate his reasons for accepting or rejecting a claimant's testimony. Under SSR 96-7p (1996 WL 374186, at *2) an ALJ's credibility determination:

> must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

Here the ALJ found (R. 16-17):

> Claimant's testimony of pain, other symptoms and functional limitations, when compared against the objective evidence and evaluated using factors in SSR 96-7p, was not credible in establishing the limitations that would preclude all light and sedentary work in view of not only the objective findings but also the inconsistent pursuit of treatment and activities. The

---

[20] To make such an evaluation, the ALJ may need to order further testing or an updated medical expert evaluation (see Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002)). Not only is the ABI test available, but as Listing 4.00(E)(4) explains, if a claimant's ABI is over .50, an exercise test can be used to examine a claimant's peripheral arterial disease pursuant to Listing 4.12(B)(2). That test may be ordered by the Social Security Administration.

20

record is also noteworthy for claimant's report that he had stopped his part-time work in December 2002 (Exhibit 3E) while admitting in his testimony that he was still doing part-time work.

Zurawski, 245 F.3d at 887 confirms that such a conclusory presentation is not susceptible of meaningful review. Our Court of Appeals there rejected as insufficient an ALJ's credibility determination that the complainant was "not entirely credible due to the inconsistencies with the objective medical evidence, and inconsistencies with daily activities."

Here ALJ Mondi's statement offers little more. To be sure, his statement about Springer's inconsistent recollection of his work history was fully articulated and relevant. But that statement stands alone--it is in stark contrast to the remaining analysis.

In terms of the objective evidence, some does support the ALJ's position: examinations in 2003 and 2005 revealed normal range of motion in Springer's hips, ankles, knees and spine and no weakness in his lower extremities. But there is a substantially greater abundance of objective evidence in the record (some of which was cited by the ALJ in his cursory review, though it was silent as to the bulk of it) that strongly buttresses Springer's statements of pain: Even the ALJ's bobtailed account noted that Springer had spondylolisthesis and a pinched nerve, left side sciatica and "signs of vascular disease" (R. 16), while the ALJ omitted reference to the abundant medical

evidence that Springer had claudication, superficial femoral artery disease, aortic-iliac disease, osteoarthritis and disc degeneration.

As Zurawski, 245 F.3d at 888, quoting Bauzo v. Bowen, 803 F.2d 917, 923 (7th Cir. 1986)(emphasis in original) directs:

> Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be examined since review of the substantiality of the evidence takes into account whatever in the record fairly detracts from its weight.[21]

Here it cannot be ascertained whether the ALJ investigated all of the evidence relating to Springer's complaints of pain, because his decision offers no real clue as to what he examined in making this determination.

ALJ Mondi fares no better in discrediting Springer on the basis of his inconsistent pursuit of treatment. Nowhere in the opinion does the ALJ ever explain what he means by that. Commissioner tries to fill in the gap, arguing that ALJ Mondi's decision hinged on the facts (1) that Springer cancelled a number of his scheduled appointments in late August and early September 2002 and failed to seek treatment shortly thereafter, (2) that it took Springer a year to follow up on the recommendation that he see a neurosurgeon and (3) that after visiting Dr. Letarte,

---

[21] [Footnote by this Court] And where the medical evidence supports a claimant's allegations, the ALJ cannot simply ignore those allegations but "must articulate 'specific reasons' for his finding" (see Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003)(per curiam), quoting SSR 96-7p).

22

Springer said that he wanted to "consider his options" (C. Mem. 13-14). But none of those events (let alone any argument based on those events) was ever even mentioned by the ALJ, and counsel for Commissioner cannot now assert any of them to prop up the ALJ's decision (Steele, 290 F.3d at 941).[22]

That leaves only the ALJ's statement that Springer's activities were inconsistent with his testimony. As to his household duties--babysitting for his children and watching television--our Court of Appeals has repeatedly admonished that such "fairly restricted" daily activities do not establish that a person is capable of full-time work (see Zurawski, 245 F.3d at 887). Nor can it fairly be said that those activities combined with his part-time work are not truly "minimal" (contrast, e.g., Johansen v. Barnhart, 314 F.3d 283, 288 (7th Cir. 2002)), for the ALJ offers no analysis of why that might be so or why his limited work is inconsistent with his complaints of pain. Simply stating that he is working part-time is not enough (Gentle, 430 F.3d at 867). It will be recalled that Springer recounted that his work is very flexible and does not require him to stand for more than

---

[22] Quite apart from their being an impermissible attempt at revisionist history, those purported factors do not bear scrutiny in substantive terms. Because an explanation of their flaws would call for an unduly protracted footnote here--a distraction in an already lengthy opinion--all that will be added is to say that if the remand were to result in an attempted ex post reliance on those matters, it would then force the detailed review that is eschewed here and that would certainly cast a cloud on any ultimate determination adverse to Springer.

23

two hours at a time, that he can stop or cancel a project at any point if he feels pain and that standing and kneeling are much easier for him than sitting (and it is only upon sitting that he must change position every 15-20 minutes).

On the record the ALJ's adverse credibility assessment is both dubious on its face and difficult to review for possible affirmance. If that negative assessment were to be reasserted on remand, it would have to be based on an explanation of just how Springer's medical history, treatment history and daily activities purportedly undercut his complaints of pain.

## Vocational Expert Hoiseth's Testimony

Springer also challenges ALJ Mondi's treatment of Hoiseth's testimony, arguing that the ALJ omitted from his consideration Hoiseth's statement that if ALJ Mondi were to give full credit to Springer's testimony, Springer could not perform any work in the national economy (S. Mem. 20-21). That contention of course links directly to the ALJ's credibility determination. For that reason nothing further need be added as to whether that alternative requires consideration on remand, for that is a function of how the credibility issue is then resolved.

## RFC Determination

In his final challenge to the ALJ's determination, Springer advances a somewhat odd objection to ALJ Mondi's RFC determination. Instead of arguing that the RFC was flawed

because it failed to take into consideration his vascular ailments, Springer contends only that the ALJ should have performed a more detailed analysis of whether Springer could perform his past relevant work before expressing his RFC in terms of an exertional category. To be sure, SSR 96-8p (1996 WL 374184, at *3-4) requires such an analysis. But because the ALJ found that Springer could not perform his past relevant work, any error he may have made on that score would be harmless.

## Conclusion

In sum, ALJ Mondi's step three and credibility determinations were both inadequately articulated and, it must be said, highly suspect. Nonetheless the well established and limiting standard of review counsels a remand, rather than permitting an outright reversal and the entry of a final judgment in Springer's favor.

Accordingly this Court remands this action under sentence four of Section 405(g) for proceedings consistent with this opinion--or in the parlance of summary judgment, both parties' Rule 56 motions are denied, while Springer's alternative motion for remand is granted. Finally, although in the end the choice of an ALJ on remand is for Commissioner to make, under the circumstances spelled out in this opinion it is urged that a fresh pair of eyes would be more likely to take an objective view of the matter than would be the case if it were returned to the

25

same ALJ.[23]

_Milton I. Shadur_ (signature)

Milton I. Shadur
Senior United States District Judge

Date: August 21, 2006

---

[23] In that respect this case provides a startling instance
of what legal philosopher Yogi Berra refers to as "deja vu all
over again." Just over five years ago this Court had the
occasion to issue its opinion in Fay v. Massanari, No. 00 C 7399,
2001 WL 755135 (N.D. Ill. July 1), which recounted the egregious
errors of the same kind that had been committed by the selfsame
ALJ Mondi and concluded in this fashion (id. at *9 (footnotes
omitted)):

> ALJ Mondi's erroneous references to the record, his complete
> failure to articulate even minimally his reasons for
> rejecting contrary lines of evidence and his completely
> unfounded speculation as to the results of Fay's surgery
> necessitate a redetermination of the weight that should have
> been given to Fay's testimony and to Fay's FRC from the
> alleged onset date of his disability until his death.
> Accordingly, both sides' motions for a disposition summary
> judgment are denied, but Nina Fay's alternative motion for
> remand is granted. Given the nature of the factors that
> have led to the remand, there is obviously room for concern
> as to returning the case for a new look by the same ALJ.
> Hence this Court urges Commissioner to exercise his
> discretion in favor of referring the case to a new ALJ
> because of the "legitimate and compelling reason[s]"
> disclosed here (see, e.g., Travis v. Sullivan, 985 F.2d 919,
> 924 (7th Cir. 1993)).

See also the Appendix to this opinion.

26

## Appendix

For a number of years after this Court took the bench, the too-often-encountered lack of quality in social security determinations by ALJs and on administrative review generated the same kind of criticism, at both District Court and Court of Appeals levels, that has more recently marked the high degree of judicial disapprobation of the work product of Immigration Judges (our own Court of Appeals has been particularly pungent in voicing that current criticism). Too frequently the adverse determinations by ALJs in social security cases gave the impression of a sort of "Don't bother me with the facts--my mind is made up" approach. And candidly, that tendency was regrettably fostered by the limited judicial review called for by regular repetition of the Richardson v. Perales standard (although such limited review is of course entirely valid when it is applied to decisions that emanate from ALJs in whom confidence can properly be reposed).

In the social security field, that problem is exacerbated by the availability, for purposes of denying benefits, of such evidentiary makeweights as RFC determinations that are made (frequently by doctors with no first-hand knowledge) by simply placing checkmarks on a form and picking numbers out of the air without any need to articulate the source of those determinations (Dr. Grant's work product in this case is an example), or sometimes consultative examinations that are conducted without

any access to prior medical history (Dr. Karri's opinion is an example).  No federal court (this one included) has an interest in second guessing legitimate administrative determinations through anything that approaches de novo review, but the administrative agencies owe it to the system to do a better job than is evidenced by cases such as this one that come to the courts for review.